## Ross, et al. v. Richardson.

(Decided January 16, 1917.)

### Appeal from Monroe Circuit Court.

Limitation of Actions—When limitation begins to run against an adult, his death, or the fact that he leaves infant heirs, does not stop the running of the statute.

H. L. & H. T. ARTERBERRY for appellants.

BAIRD & RICHARDSON for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

Two appeals come upon this record. W. E. Ross is the appellant in one and Lillie O. Gray and others, the appellants in the other, and H. M. Richardson is the appellee in both. The cases involve substantially the same question and were consolidated and heard and disposed of together in the court below on the same evidence. They involve the title to two small tracts of land, one claimed by Ross and the other by the Grays. The suits were brought to recover the possession of these lands from Richardson and damages for their detention. The lower court dismissed the petition of the plaintiffs, Ross and the Grays, and they have brought the case here.

The Grays, who are the heirs of James D. Gray, deceased, set out in their petition that they are the owners and entitled to the possession of a tract of land that descended to them from James D. Gray. The land of which they claim to be the owners is described in the petition as being on the waters of Meshack creek, "beginning at said black oak and mulberry stump, beginning corner, running thence N. 80 E. 7 poles across Meshack creek to a large sycamore and two box elders standing on the east bank of said creek; . . . . thence S. 26 W. 6½ poles to a stone planted as a corner between Kirkpatrick and James Black; thence S. 60 W. 46 poles to a dead beech tree and a stone planted in the corner of Isham F. Geralds' fence; thence N. 30 W. 150 poles to a maple and sycamore on the bank of said creek; thence N. 20 W. 80 poles to the beginning."

In an amended petition they averred that the land in controversy, which contains about seven acres, begins at "a black oak and mulberry stump in the mouth of a lane; thence with the old creek bed S. 35 E. 32 poles; thence with the same N. 80 E. 12 poles to the fence; thence with the same S. 47 E. 20 poles; thence with the same S. 10 W. 7 poles; thence with the same S. 52 W. 15 poles; thence with same S. 24 W. 22 poles to the original line; thence N. 20 W. 80 poles to the beginning."

Richardson in his answer denied that the plaintiffs were the owners of or entitled to the possession of the land claimed by them, and averred that he was the owner of a tract containing 360 acres, "beginning at a large black oak and mulberry stump on the bank of Meshack creek; thence S. 80½ W. 114 poles to a sugar

tree stump and a large planted stone, corner to Leslie; thence N. 118 poles with Leslie's line to two beeches also a corner to Leslie; . . . . thence to a stone planted on the brink of the bank of Cumberland river 20 poles above the mouth of Meshack creek; thence N. 1 E. 72 poles to a beech; thence N. 10 E. 245 poles to a maple and sycamore on the bank of the creek; thence with the creek to the beginning, containing 360 acres."

He further set out that he was the owner of a tract of land containing 14½ acres, describing same by metes and bounds, and also a tract containing 52 acres, describing it by metes and bounds, and also the owner of a fourth tract containing seven acres, adjoining the 360-acre-tract and bounded as follows: "beginning at a black oak and mulberry stump, corner to Kirkpatrick; thence S. 10 E. 275 poles with an old turn row where an old fence once stood to a box elder, maple and sycamore; thence with the meanders of the creek to the beginning."

Ross in his petition described the land of which he claimed to be the owner as "beginning at a maple, elm and sugar tree, corner to Richardson and Gray; thence with Gray's line S. 50 E. 166 poles to where two beeches stood, corner to R. H. Richardson; thence with his line S. 80 W. 30 poles to a stone, corner to same and the river field; thence with its same course 10 poles to creek, corner to same and Henry Richardson; thence with his line up the creek with its meanders to his corner, the bluff of the creek; thence with the same to the beginning."

In an amended petition he described the land claimed by him and which is in controversy as "beginning on a sugar tree, maple and elm, corner to H. M. Richardson and Gray; thence S. 30 W. 12 poles to two willow trees on the bank of creek; thence with Henry Richardson's line, S. E. 60 poles to the creek; thence up the creek with its meanders N. 54 E. 26 poles; up same N. 44 W. 14 poles to a stake on the bank of same; thence N. 2 W. 46 poles to a stake on the bank of same; thence N. 7½ poles to the beginning." And it was averred that Richardson wrongfully had possession of about seven acres of this boundary.

Richardson in his answer denied that he had possession of any land owned by Ross and set up the tracts of land that he owned, describing them as he did

in the answer in the Gray case. Richardson further set up in his answer in the Gray case, as well as in the Ross case, that he had been in the adverse possession of the land in controversy for twenty years or more. He also averred that the claim of the Grays was within the champerty statute. The claim of adverse holding was put in issue by the Grays as well as by Ross and the plea of champerty was also controverted by the Grays.

It appears that the land in dispute joins on the east the 360-acre Richardson tract which was conveyed to him by Kirkpatrick, and that the Grays and Ross have title to land adjoining this disputed land on the east. This disputed land, according to the maps, lies at two separate places in the bottoms of Meshack creek, each parcel of disputed land containing probably seven acres. Meshack creek, which runs on, over and between the lands of Richardson on the west and the lands of the Grays and Ross on the east, is a very crooked stream, and each tract of disputed land lies in bends of the creek.

It seems that in January, 1884, Elijah Kirkpatrick and his wife conveyed to Richardson the 360 acre, the 14½ acre, and the 52-acre tracts of land that are now owned by him. These three tracts of land are each described in the deed by metes and bounds, courses and distances. This deed was put to record in the proper office in May, 1884. In this deed the 360-acre tract, is described as "beginning at a large black oak and mulberry stump on the bank of Meshack creek." The other descriptions in the deed relate to lines about which no question is made until we come to the southern corner of the eastern line of this tract, which is described as being "a stone planted on the brink of the bank of Cumberland river 20 poles above the mouth of Meshack creek; thence N. 1 E. 72 poles to a beech; thence N. 10 W. 245 poles to the beginning." And the disputed land lies along the land between the black oak and mulberry stump on the bank of Meshack creek at one end and the stone planted on the bank of the Cumberland river near the mouth of the Meshack creek on the other.

It also appears that in December, 1884, Kirkpatrick sold to the ancestors of the Grays a body of land con-

taining 470 acres, less the 52 acres previously sold to Richardson, which was excepted from this boundary. This deed was put to record in the proper office in May, 1885. This deed described the 470 acres as "beginning at said black oak and mulberry stump, corner of lot number one in the division of the land of Hugh Kirkpatrick." From this point the courses of this deed do not touch the line in controversy until they get to "a stone planted in the corner of Isham S. Geralds' fence; thence N. 30 W. 150 poles to a maple and sycamore on the bank of said creek; thence N. 20 W. 80 poles to the beginning."

It will be observed that both the Richardson deed of 360 acres and the deed to Gray called for the black oak and mulberry stump as a beginning corner. From this point the Richardson lines run west and north and then south to the stone on the bank of the Cumberland river and from there north 1 east 72 poles, north 10 west 245 poles to the beginning at the black oak and mulberry stump, while the lines of the Gray land, starting at the black oak and mulberry stump, run north and east and then south to a corner at which they turn north 30 west 150 poles, north 20 west 80 poles to the beginning at the black oak and mulberry.

There is no dispute that the black oak and mulberry at the north end and the stone on the Cumberland river at the south end are established corners in the Richardson deed, nor is there any dispute that the beech on the line of the Richardson deed between the black oak and mulberry stump at one end and the stone at the other is an established corner.

It also appears that the lines of the Gray deed do not touch the lines of the Richardson deed all the way from the stone to the black oak and mulberry stump.

South of this Gray land and joining the Richardson land on the east is the Ross land.

It seems that Ross obtained the land that he now claims from W. B. Milam by a conveyance made in 1907, which was recorded in 1910. His deed calls for the beginning corner at a maple, elm and sugar tree corner to Richardson and Gray. The courses of this deed then run in an easterly direction, finally coming again to the Richardson line, and then with his line to the beginning.

It will be noticed that the title to the Gray land and the Richardson land was derived from the same source, Elijah Kirkpatrick. The Ross title does not appear to have been derived from ᠆Kirkpatrick, but the deed to Ross, which was made in 1907, calls for the Richardson line, and this of course makes his line dependent upon the location of the Richardson line.

Counsel for Richardson concede that Richardson's deed does not embrace the disputed land, and so the right of Richardson to this disputed land depends on his adverse holding. It appears from the evidence of Hugh K. Bedford that the deed he made to Richardson, acting as agent for Kirkpatrick, by oversight or mistake, did not include all the land Richardson bought, or this disputed land which was owned by the Kirkpatricks, and which Bedford intended to and did, in fact, sell to Richardson. Bedford testifies that the first information he had that the deed did not cover this land was when Richardson came to see him about it. He says he told Richardson it did not make any difference whether his deed covered it or not, as he had bought, paid for, and been put in possession of it. Bedford further says that he sold the land to Gray, and that Richardson was in possession of this land in dispute when Gray bought it. That he did not sell the land in dispute to Gray, nor did Gray buy it or pay for it, and that if Gray's deed covers this land it was a mistake. This witness further said that Richardson always had possession of the land in dispute, and he had never heard any question of his right to it until this suit came up, although he lived in the immediate neighborhood.

Richardson testifies that he took possession of the land in controversy in 1884, and had had it in possession ever since through himself, tenants and cultivation. It also appears that Kirkpatrick in 1849 got a patent to land which covers this land in dispute and that Richardson thought his deed covered the land embraced in this patent, but that when he found out it did not, he asked Bedford about it and Bedford told him it did not make any difference, that he had bought it and could hold it under the patent. He further said that this patent land had been used as a part of the farm which he purchased from Bedford ever since the patent was issued, and that when he bought the land from Bedford he took possession of the land covered by this patent

and that it had been continuously in cultivation since 1886.

Marion Coulter, John Scott, J. R. Head, James H. Milam, William Geralds and Turner Bradley all testify that this land in dispute had been claimed by Richardson for more than twenty years and cultivated by him and his tenants and was spoken of generally as the Richardson land.

There is further evidence in behalf of Richardson that this land in controversy was enclosed by fencing.

On the other hand, several witnesses who testify in behalf of the Grays and Ross say that Richardson did not have possession of this land or have it in cultivation; but we think the weight of the direct evidence supports the contention of Richardson that, believing himself to be the owner of this disputed land by virtue of his purchase from Kirkpatrick, he at once took possession of it and held it in the same manner that he did the remainder of the land purchased from Kirkpatrick, and that this adverse holding and claim of title continued without interruption from 1884, or shortly thereafter, until the institution of this suit.

It is contended by counsel for the Grays that the plea of limitation is not available because some of the Grays who bring this suit were infants when Richardson claims he first took adverse possession of the land, and this being so, the statute did not run against them as they arrived at age less than fifteen years before this suit. The evidence, however, shows that James D. Gray, the ancestor of the plaintiffs, lived for several years after 1884, and it was during his life that the adverse claim and holding by Richardson started, and having started in his life, it was not interrupted by his death or by the fact that he left infant children. Having commenced to run against him, neither his death nor the infancy of the children interrupted it. Clark v. Trail, 1 Met. 35; Hale v. Ritchie, 142 Ky. 424.

On the part of Ross the contention is made by his counsel that the statute of limitation is not available because it is said that Ross was also claiming to own the land in controversy between him and Richardson. But, while the evidence on this subject is, as we have said, conflicting, the weight of it we think is with Richardson.

It is also suggested that there is no plea of limitation in the Ross case. But we do not so understand the record. On the contrary, we think that, both in his answer to the Gray petition as well as to the Ross petition, Richardson distinctly relies on his adverse holding of the land in dispute for such length of time as to invest him with the title. The fact that Richardson's title papers do not cover this land in dispute is really not a material issue in the case, as he does not claim the land under his title papers but by adverse possession. And in this connection it may be said that we do not find in the record any contradiction of the evidence of Bedford heretofore set out. It therefore appears that Richardson in good faith took possession of this land in controversy, believing himself to be the owner of it under his purchase from Bedford as the agent of the Kirkpatricks.

There is also a minor dispute between these parties about some trees, and it is shown that some employes or hands of Richardson did, in ignorance of the exact location of the line between the Grays and Richardson, cut some small trees on the Gray land. But it is also shown that the Grays cut some trees on the Richardson land. The lower court on this question of fact as to the timber, as well as to the lands in dispute, held, on the facts, that Richardson was entitled to the land, and that the Grays were not entitled to recover anything on account of timber.

Giving to the judgment of the chancellor the weight usually accorded in cases of fact, we have reached the conclusion that the evidence does not justify us in disturbing his finding, and the judgment in each case is affirmed.